[Cite as *State v. Dumas*, 2015-Ohio-2683.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 12 MA 31 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| NATHANIEL DUMAS | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:     Criminal Appeal from the Court of
                              Common Pleas of Mahoning County,
                              Ohio
                              Case No. 11 CR 429

JUDGMENT:                     Affirmed.


APPEARANCES:
For Plaintiff-Appellee:       Atty. Paul J. Gains
                              Mahoning County Prosecutor
                              Atty. Ralph M. Rivera
                              Assistant Prosecuting Attorney
                              21 West Boardman Street, 6th Floor
                              Youngstown, Ohio  44503


For Defendant-Appellant:      Atty. Paul Zindle
                              Appellate Review Office
                              University of Akron School of Law
                              Akron, Ohio  44325-2901

                              Nathaniel Dumas, *Pro se*, #622-439
                              Ross Correctional Institution
                              P.O. Box 7010
                              Chillicothe, Ohio  45601

JUDGES:
Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Mary DeGenaro

                              Dated:  June 29, 2015

WAITE, J.

{¶1} Appellant Nathaniel Dumas appeals from a Mahoning County Common Pleas Court judgment convicting him of felony murder, aggravated robbery, and possession of a firearm while under disability. Appellant was tried as an accomplice to an armed robbery of Galaxy Seafood store in Youngstown. During trial, Appellant was disruptive and ultimately removed from the courtroom. On appeal, he alleges that failure to return him to the courtroom after his apology amounted to a constitutional violation, two of his charges should have merged for sentencing purposes and that he was provided ineffective assistance at trial. A review of the record leads to the conclusion that all of Appellant's arguments are meritless and the judgment of the trial court is affirmed.

Statement of Facts

{¶2} On April 8, 2011, Appellant and his cousin, Warren Wright drove to James Thomas' house in Youngstown, Ohio, to discuss robbing the Galaxy Seafood store ("Galaxy"). Appellant and Wright offered Thomas $20-30 to press the doorbell buzzer at Galaxy so that someone would unlock the front door and let them in. Once the door was opened, Wright would commit an armed robbery. Pursuant to this plan, the three men left for Galaxy in Wright's tan Cadillac. Appellant was driving. They stopped at a sporting goods store so that Wright could steal a ski mask and glasses to wear during the robbery. They also bought and drank beer at a drive-through on Belmont Avenue. As they drove, Appellant and Wright further discussed their plans for the robbery.

{¶3} Appellant dropped off Thomas and Wright a few blocks away from Galaxy. At the same time, Lusonyta Madison arrived at Galaxy to visit her daughter,

C.L., age 15, who worked there. Before entering, she saw Wright and Thomas walking towards the building.

{¶4} Mike Walker, a Youngstown Police Officer, was hired by Galaxy's owner as a security guard and was working on the night of the crime in full uniform, including his service weapon.

{¶5} Thomas and Wright entered the store sometime around 6:00 p.m. Thomas was ready to press the door buzzer, but a patron exited the store at that moment, letting them in. Thomas entered first. Wright, walking behind with the ski mask on, pushed Thomas out of the way and pointed his weapon at the store clerk, C.L. He approached the register and said, "give me the money, give me the money." (Tr. Vol. III, p. 501.) Walker was in the store and observed the robbery as it was unfolding. He yelled, "police, drop the gun," and drew his weapon. (Tr. Vol. III, p. 561.) When Wright did not comply, Walker fired three rounds, hitting Wright twice in the chest. Wright collapsed. Walker then secured the weapon and called for backup support.

{¶6} Youngstown Detective/Sergeant Daryl Martin responded to Walker's call. He spoke to Ms. Madison. Ms. Madison told him about Thomas' part in the crime. She also said she recognized the masked gunman as "Shelly's brother." (Tr. Vol. III, p. 497.) "Shelly" is a reference to Delshella Lynch, Wright's sister and Appellant's first cousin. Ms. Madison called Ms. Lynch after the robbery to tell her that her brother had been shot. Wright's tan Cadillac was found parked about three blocks from Galaxy.

{¶7} Thomas initially denied involvement with the crime. He later told police about not only his own involvement, but Appellant's, as well.

**{¶8}** On April 15, 2011, Appellant was arrested. Following his arrest, he claimed that he was with a man named Rodney Clay on the evening of the robbery. Detective Martin spoke with Clay, but Clay was unable to confirm Appellant's story or provide him with an alibi.

**{¶9}** Trial began on January 24, 2012. Immediately prior to *voir dire*, the court had scheduled time to resolve pretrial motions Appellant had filed *pro se*. During the proceedings, Appellant constantly interrupted his counsel, the prosecutor and the judge while the motions were being discussed. During the initial stage of *voir dire*, Appellant interrupted and accused the judge of being biased in favor of the prosecutor. When *voir dire* was well under way, Appellant again interrupted the proceedings and objected to the manner in which the prosecutor was asking questions. He stated: "I'm not going to trial with that jury". (Tr. Vol. I, p. 186.) After another series of interruptions, he said he wanted to hire his own attorney and repeated that he was not going to trial. At this point, defense counsel told the court that Appellant no longer wanted his representation.

**{¶10}** Appellant became even more unruly. He attempted to issue orders to the judge, made various pronouncements about what he was and was not going to do in court, and told the judge "I don't fear you." (Tr. Vol. I, p. 190.) Appellant's mother, who was in the courtroom, attempted to explain Appellant's behavior, but Appellant interrupted her as well, and tried to instruct the court as to the manner in which the judge could talk to his mother. Appellant referred to the proceedings as a conspiracy against him. He interrupted the prosecutor as she attempted to respond to his accusations. When he again stated that he was not going to trial, the judge asked him how long it would take to hire a new lawyer. He said it would not take him

very long. The judge offered him 24 hours to find a lawyer. Appellant protested that he could not possibly find another attorney in 24 hours and stated that he would not go to trial with the present jury. Appellant's tirade included his statement that he did not need to know the law to know the jury was prejudiced against him. After the final outburst, the court told Appellant that he could proceed with a new attorney within 24 hours, or be taken to the third floor of the courthouse to observe the trial by video and his present counsel would continue with the case. Appellant then asked for new counsel to be appointed, which request was denied, and the trial was continued to the next day.

{¶11} When trial reconvened, Appellant had not hired new counsel. Appellant railed against the judge for only giving him 24 hours to find counsel, and he refused to participate in the trial. He complained about the discovery process, alleged violations of his constitutional rights, lack of preparation for trial, and continued insisting that he was not going to allow the court to convene a trial. The court asked Appellant if he was finished with his interruption, and Appellant answered, "I'm done." (Tr. Vol. I, p. 204.) At this point, the judge continued the trial to the next day in order to proceed with *voir dire*. Appellant interrupted again, stating "[t]hat's not going to happen neither. I told y'all, I'm not about to let y'all do what you think y'all going to do with me." (Tr. Vol. I, p. 205.)

{¶12} The next morning the case reconvened, and defense counsel objected when the court ordered that Appellant be removed to another room to view the trial. The prosecutor pointed out that Crim.R. 43(B) allows the court to remove a defendant for disruptive behavior, and that Appellant had a history of disruptive behavior not only in this case but in a prior case in Youngstown Municipal Court. Appellant had

also written a letter to Detective Martin in which he threatened that "there will be a commotion in this honorable court" if forced to go to trial with his current defense counsel. (Tr. Vol. I, p. 218.) The court gave Appellant a final chance to address the issues regarding his behavior in court. Instead, Appellant seized the opportunity to begin a rambling diatribe where he expressed that he wanted a suppression hearing held, and insisted that he had a right to new counsel of his choice. He claimed there had been a *Brady* violation in his case, that Thomas should have been charged with murder, that he was never given a bill of particulars, and generally that his due process rights had been violated. He demanded that the prosecutor give him a statement of what Thomas' testimony would be in court. This rambling statement continued for a considerable period of time.

{¶13} The court then ordered Appellant to be removed to another room where he was able to view the trial on television monitors. The court assured Appellant he would have access to his counsel and would be able to see and hear everything that was going on in court, and they would also be able to see him. The judge determined there was nothing in Appellant's demeanor that would cause him to change his mind about removing Appellant from the courtroom. Prior to his actual removal, while the judge dealt with another pending motion, Appellant interrupted and said "I want to apologize for my past actions in this courtroom." (Tr. Vol. II, p. 246.) At the conclusion of the motions hearing Appellant was removed. *Voir dire* was completed.

{¶14} The state called as witnesses Kevin Shaw who owned Galaxy, Officer Walker, Lusonyta Madison, her daughter C.L., James Thomas, various police officers, and a deputy coroner. The state also called Delshella Lynch, who testified

about a lengthy conversation she had with Appellant in which he confessed to his involvement with the crime. She confirmed that Wright was her brother, and Appellant is her first cousin. (Tr. Vol. III, pp. 598-599.) Ms. Lynch managed a hair salon where Madison and C.L. were customers. She stated that Appellant and Wright were very close, like brothers, and spent nearly every day together. Wright came to her salon in his tan Cadillac at about 1 p.m. on the day of the crime. At about 6 p.m., she received a call from Madison that Wright had been involved in a robbery and shooting at Galaxy. She immediately drove there and discovered that Wright had been shot. She followed the ambulance to the hospital, and many of her relatives were there when she arrived. Ms. Lynch testified that the only relative who did not appear at the hospital was Appellant. (Tr. Vol. III, p. 608.)

{¶15} Ms. Lynch testified that two days later she was staying at her mother's house. Appellant arrived, and she asked him what had happened at Galaxy. They went outside to talk privately and Appellant confessed his involvement. (Tr. Vol. III, p. 612.) Appellant said that Wright picked him up in his car and they drove to a store to steal a ski mask and glasses. They got back in the car and talked about doing a robbery. (Tr. Vol. III, p. 613.) Wright devised a plan to find someone to press the door buzzer to get them into Galaxy. They asked two people who said no before asking Thomas, who said he would do it for $20. The three returned to the car and finished their plans while driving to Galaxy. Appellant was standing outside in back of the store when the robbery occurred. When he heard shots, he jumped into Wright's car and drove away. He left the car nearby at his aunt Carolyn's house. Appellant told her Ms. Lynch could get the keys from Tahesia Dumas, another cousin, and she later retrieved the keys and car from the place Appellant had indicated.

{¶16} On February 1, 2012, a jury convicted Appellant of felony murder in violation of R.C. 2903.02(B)(D), with an accompanying firearm specification, in violation of R.C. 2941.145(A). He was sentenced to fifteen years to life in prison. He was also convicted of aggravated robbery, in violation of R.C. 2911.011(A)(1)(C), a felony of the first degree, with an accompanying firearm specification, in violation of R.C. 2941.145(A). His sentence for aggravated robbery was ten years in prison. The two firearms specifications were merged at sentencing and a three-year prison term was imposed. The punishments were ordered to run consecutively, for a total of twenty-eight years to life in prison. This timely appeal followed.

<u>ASSIGNMENT OF ERROR NO. 1</u>

THE TRIAL COURT COMMITTED CONSTITUTIONAL ERROR WHEN IT EXCLUDED APPELLANT DUMAS FROM HIS TRIAL IN VIOLATION OF THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

{¶17} Appellant contends that his Sixth Amendment rights were violated when the trial court initially removed him during *voir dire*, and further when the judge denied his request to remain in the courtroom after he apologized for his poor behavior. The Confrontation Clause of the Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." This concept has been broadened to include the right of the accused to be present for his own trial. *State v. Williams*, 6 Ohio St.3d 281, 286, 452 N.E.2d 1323, 1330 (1983), citing *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970).

{¶18} Section 10, Article I of the Ohio Constitution mandates that "[i]n any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel." These precepts are also contained within Crim.R. 43(A)(1): "the defendant must be physically present at every stage of the criminal proceeding and trial * * * except as otherwise provided by these rules."

{¶19} A defendant's presence is required at trial unless he waives his right or extraordinary circumstances exist requiring exclusion, such as his misconduct. *State v. Brown*, Fifth Dist. No. 2003-CA-01, 2004-Ohio-3368, citing *State v. Williams*, 6 Ohio St.3d 281, 286, 452 N.E.2d 1323 (1983). "Where a defendant's conduct in the courtroom is so disruptive that the hearing or trial cannot reasonably be conducted with the defendant's continued physical presence, the hearing or trial may proceed in the defendant's absence or by remote contemporaneous video." Crim.R. 43(B). To find that a defendant's right to confrontation was violated, we must find that the trial court abused its discretion in removing the defendant. *Allen*, 397 U.S. at 343; *see also, State v. Chambers*, 10th Dist. No. 99AP-1308, 2000 WL 963890 (July 13, 2000). The exclusion of a defendant should be considered in light of the whole record. *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985).

{¶20} A trial judge is empowered to maintain decorum and enforce reasonable rules to insure the orderly and judicious disposition of the court's business. *State v. Clifford*, 162 Ohio St. 370, 372, 123 N.E.2d 8 (1954). The United States Supreme Court has stated that "[w]e believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining

the appropriate courtroom atmosphere will be best in all situations." *Allen* at 343. There are certain constitutional options available for a judge to deal with an extraordinarily disruptive defendant, among which are to cite the defendant for contempt or remove the defendant from the courtroom until he is prepared to conduct himself properly. *Allen* at 344.

{¶21} Here, Appellant was repeatedly disrespectful of the court, the lawyers, witnesses and the jurors, and threatened further disruptions before he was removed. Prior to beginning *voir dire*, Appellant interrupted the proceedings by accusing the state and the potential jurors of being racist. He complained that co-conspirator Thomas was not also being charged with murder. He accused the court of showing favoritism towards the state. As *voir dire* proceeded, Appellant repeatedly stated that he refused to go to trial with the selected jury because the entire jury was prejudiced and because he did not like his counsel.

{¶22} As Appellant continued to disrupt the court, the judge warned him, "[m]y other alternative is to remove you from the courtroom and place you in a room with a camera, and that's it, and you will watch your trial." (Tr. Vol. I, pp. 189-190.) This did not deter Appellant. When his mother came forward to make a statement to the court, Appellant continued to disrupt and talk over the court as well as interrupt his mother. When the court told Mrs. Dumas that she needed to conclude her statement, Appellant responded, "[s]he can talk. You ain't got to stand down till you done talking. You ain't got the freedom -- don't bow down to him. For real. I mean, she had enough. Don't disrespect my mother, man." (Tr. Vol. I, pp. 193-194.)

{¶23} Following this, Appellant continued to be disruptive and repeat his desire for new counsel. To this end and at this late date, the court granted Appellant

a twenty-four hour period to try and obtain new counsel. After the twenty-four hours, no new counsel was obtained. Defense counsel objected to Appellant's removal from the courtroom. The prosecution produced a letter written by Appellant on December 3, 2012, stating that "before I go to trial with Attorney Carfolo, there will be a commotion in this honorable court, Sir." (Tr. Vol. I, p. 218.) The state also presented evidence that Appellant was excluded from a prior court proceeding in municipal court. *State v. Dumas*, 7th Dist. No. 10-MA-50, 2011-Ohio-1003. In that earlier case, Appellant was disruptive in court and accused testifying witnesses of lying. We upheld the municipal court's decisions both in regard to contempt and concerning Appellant's removal from the courtroom. *Id.* at ¶62.

**{¶24}** In the instant case, based on Appellant's prior acts in the courtroom, the letter he sent, and his continuous disruptions, the court determined that Appellant needed to be removed from the courtroom. The jury was properly instructed to disregard Appellant's absence. (Tr. Vol. II, p. 249.)

**{¶25}** From the above evidence, it is clear that the court was well within its discretion to remove Appellant. When a defendant is removed from the courtroom, Crim.R. 43(B) allows that if a court "determines that it may be essential to the preservation of the constitutional rights of the defendant, it may take such steps as are required for the communication of the courtroom proceedings to the defendant." Once Appellant was removed from the courtroom for his disruptive behavior, he was allowed to watch the proceedings via video with audio and was still able to communicate with his counsel. Therefore, there was no violation of Appellant's Sixth Amendment or statutory right to be present for his trial.

**{¶26}** Appellant urges that there is an automatic right for a defendant to be allowed to return to the courtroom once an apology has been made. Appellant misreads the holding of *Allen* in coming to this conclusion. *Allen* does say that "[o]nce lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." *Id.* at 343. This language is permissive, not mandatory and must be based on the trial court's discretion as it uses the word "can" and not "must." Regardless, this language is dicta. Immediately prior to that statement is the holding in the matter: "we explicitly hold today that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Id.* Whether a defendant is actually sincere in his apology and is willing to conduct himself or herself properly in the courtroom is obviously a determination that the trial judge must make. In this case, the court had already given Appellant a number of chances to correct his behavior. Based on the prior history of Appellant's court disruptions and his repeated refusals to have anything to do with the current proceedings, the court was well within its discretion to arrange an alternative room for Appellant to view the trial and consult with his attorney. Therefore, Appellant's first assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT COMMITTED PLAIN ERROR AND VIOLATED R.C. 2941.25 (MULTIPLE COUNTS STATUTE) AND THE DOUBLE JEOPARDY CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHEN IT SENTENCED APPELLANT DUMAS TO MULTIPLE TERMS ON AGGRAVATED ROBBERY AND MURDER AS THEY ARE ALLIED OFFENSES OF SIMILAR IMPORT.

**{¶27}** In his second assignment of error, Appellant claims that the trial court erred in sentencing him for both felony murder and aggravated robbery because the two offenses constitute allied offenses of similar import. Appellant claims that, in so doing, the trial court violated R.C.2941.25 and the double jeopardy clause of the Fifth Amendment. This argument also fails.

**{¶28}** The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, and the Ohio Constitution, Article I, Section 10, protect a defendant against multiple punishments for the same offense. *State v. Martello*, 97 Ohio St.3d 398, 2002-Ohio-6661, 780 N.E.2d 250, ¶7. In essence, though, the Double Jeopardy Clause "does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). When dealing with multiple punishments for the same offense, the issue is "whether the General Assembly intended to permit multiple punishments for the offenses at issue." *State v. Childs*, 88 Ohio St.3d 558, 561, 728 N.E.2d 379 (2000).

**{¶29}** In Ohio, this constitutional protection is codified in R.C. 2941.25(A), which states: "Where the same conduct by defendant can be construed to constitute

two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one."

**{¶30}** In 2010, the Ohio Supreme Court revised its interpretation as to the application of R.C. 2941.25(A) and held that: "When determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, syllabus. *Johnson* overruled a previous test established in *State v. Rance*, 85 Ohio St.3d 632, 710 N.E.2d 699 (1999) that required an abstract examination of the elements of two crimes as the means for determining allied offenses. *Johnson* found that the *Rance* test was contrary to the plain language of R.C. 2941.25, which specifically instructs the court to view each defendant's conduct. Although *Johnson* left certain questions unanswered as to the practical application of R.C. 2941.25(A), we have previously observed that "[o]ur only new guidance [from *Johnson*] is to consider the defendant's conduct and thus the particular facts of each case to determine whether the offenses are of similar import." *State v. Gardner*, 7th Dist. No. 10 MA 52, 2011-Ohio-2644, ¶23.

**{¶31}** Under *Johnson*, determining whether offenses are allied within the meaning of the statute involves a two-step process. We first determine whether, when the elements of the two crimes are compared, the elements correspond to such a degree that the commission of one crime will necessarily result in the commission of the other. Although *Rance* called for this comparison to be done in the abstract, *Johnson* requires that the conduct of the accused be considered when determining whether the elements of the two offenses are allied. *Johnson* at paragraph one of

the syllabus. If we determine that the two offenses are allied, the second step of the analysis requires us to determine if the offenses actually were committed by the same conduct, *i.e.*, "a single act, committed with a single state of mind." *Id.* at ¶49.

**{¶32}** The Ohio Supreme Court has further clarified its holding in *Johnson* in *State v. Ruff*, Slip Opinion No. 2015-Ohio-995. In *Ruff* the Court held that a trial court must evaluate not just two, but three factors as part of the second step of the *Johnson* test: the defendant's conduct, the defendant's animus, and the import of the multiple offenses: "Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *Id.* at paragraph three of the syllabus. *Ruff* further held that: "Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at paragraph two of the syllabus.

**{¶33}** The felony murder statute, R.C. 2903.02(B), provides: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." The aggravated robbery statute, R.C. 2911.01(A)(1), provides: "No person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or offense, shall do any of the following: * * * Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it."

{¶34} In this case, Appellant's conduct as an accomplice with respect to both the aggravated robbery and the felony murder were exactly the same: he joined with Wright and Thomas to plan and execute an armed robbery of Galaxy, and in the course of the robbery, Wright was killed. Whether he was convicted of only one crime or the other, the same evidence would have been used against him. Therefore, the first prong of the *Johnson* test is fulfilled and the crimes are allied. This is only the first step of the analysis, however.

{¶35} Even though felony murder and the aggravated robbery under the facts of this case pass the first, general, portion of the *Johnson* test, Appellant may still be sentenced for both crimes if the crimes were committed separately, or there was a separate animus for the crimes, or if there exists a dissimilar import. *Ruff* specifically held that dissimilar import exists when the crimes involve separate victims. Both crimes can then be punished. In this case, the victims of the aggravated robbery and the victim of the felony murder were different. The robbery was committed against Galaxy Seafood, its owner Kevin Shaw, and against C.L., the employee working at the time. The felony murder was committed against Wright, an accomplice to the crime. Wright was not in any manner the target of the robbery because he was helping to commit the crime. Thus, in cases where the victims are completely different, there is no merger of the offenses of felony murder and the predicate underlying felony. *State v. Ragland*, 5th Dist. No. 2010CA00023, 2011-Ohio-2245 (a post-*Johnson* case holding that felony murder and aggravated robbery are not allied offenses when the victims are different); *Osman*, *supra* (a post-*Johnson* case holding that, when there are separate victims, felony murder and aggravated robbery do not merge).

**{¶36}** Therefore, when considering all of the facts specific to this case, the convictions for aggravated robbery and felony murder are allied offenses, but are not allied offenses of similar import. Thus, they do not merge for sentencing purposes. Appellant's second assignment of error is overruled.

<u>ASSIGNMENT OF ERROR NO. 3</u>

TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHEN HE FAILED TO PRESENT AVAILABLE EVIDENCE ESTABLISHING THAT APPELLANT DUMAS WAS NOT AT THE CRIME SCENE.

**{¶37}** Appellant alleges that his counsel was deficient by failing to adequately question and draw out the testimony of Ms. Sharilillie Starks, a worker at Galaxy, regarding her description of the unknown individual she observed behind Galaxy just after the crime was committed. Looking at the facts of this case, Appellant cannot establish trial counsel's representation was either deficient or prejudicial.

**{¶38}** According to the U.S. Supreme Court, "the Sixth Amendment right to counsel exists 'in order to protect the fundamental right to a fair trial.'" *Lockhart v. Fretwell*, 506 U.S. 364, 368 (1993), citing *Strickland v Washington*, 466 U.S. 668, 684 (1984), *Nix v. Whiteside*, 475 U.S. 157, 175 (1986), *United States v. Cronic*, 466 U.S. 648, 653 (1984), and *United States v. Morrison*, 449 U.S. 361, 364 (1981). The Sixth Amendment's guarantee of the right to counsel "is the right to the effective assistance of counsel." *State v. Bradley*, 42 Ohio St.3d 136, 150, 538 N.E.2d 373, 391 (1989), quoting, *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d

763, fn. 14, (1970). This right "is recognized not only for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." *Cronic*, 466 U.S. 648, 658.

{¶39} The Ohio Supreme Court has held that "*Strickland v. Washington * * *,* establishes the standard for judging ineffective-assistance claims." *State v. Burke*, 97 Ohio St.3d 55, 2002-Ohio-5310, 776 N.E.2d 79, ¶5. *Strickland* establishes a two-part test to prove a claim of ineffective assistance of counsel. "To obtain a reversal of a conviction on the basis of ineffective assistance of counsel, the defendant must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." *State v. Madrigal*, 87 Ohio St.3d 378, 388-389, 721 N.E.2d 52, 64 (2000), citing, *Strickland*, *supra*.

{¶40} To first determine whether counsel's assistance was ineffective requires a showing that counsel's performance fell below a certain objective standard of reasonableness. *Madrigal* at 388, citing *Strickland*. This standard is highly deferential towards counsel. *Strickland* at 689. In addition, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." *Id.*

{¶41} Even if counsel's assistance falls below this objective standard, reversal of a conviction is not warranted unless the second prong is also met. *See Bradley, supra,* at 142-143. Here, the defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland, supra,* at 694. In making this determination, we must consider the totality of the evidence.

**{¶42}** "Judicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel. To justify a finding of ineffective assistance of counsel, the appellant must overcome a strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *State v. Sallie*, 81 Ohio St.3d 673, 674, 693 N.E.2d 267, 269 (1998).

**{¶43}** In this matter, Appellant is unable to meet either prong of the *Strickland* test. Appellant claims that trial counsel was ineffective for not questioning Starks more diligently regarding her description of the man she saw behind Galaxy seconds after Wright was shot. Appellant contends that counsel should have alerted the jury to a discrepancy between Appellant's actual physical characteristics and the characteristics of the man Starks described.

**{¶44}** While this tactic might have been useful to show that no one at the scene other than Thomas actually saw Appellant, the question of whether Appellant was present at the crime scene did not need to be answered in order to obtain a conviction. Appellant's physical presence is immaterial to his conviction because he was convicted under a theory of complicity. Under this theory, it does not matter where Appellant parked the car or how close he was to Galaxy when the crime was committed. His guilt is derived from his co-conspirator's acts. While firmly placing Appellant at the scene may have slightly improved the prosecution's case, proving that he was not there does nothing to exculpate him.

{¶45} Our review of this record reveals that Appellant's counsel provided effective assistance in his line of questioning. He did establish that Ms. Starks quickly left Galaxy after the shooting and she was startled by a man who was standing outside. He was able to show that she was standing very close to him before he got into a car and hurriedly drove away, and that she could not identify the man in a photo array that included Appellant. On cross-examination, she admitted that she was afraid when she ran outside, that everything happened very fast, and that she simply did not get a good enough look at the person she saw in back of the store to be able to identify him. (Tr. Vol. V, pp. 984-985.) Counsel's decision not to question Ms. Starks further appears to be a matter of sound trial strategy, since any further testimony might easily have undermined what had already been said.

{¶46} Even if we were to find error in counsel's line of questioning, Appellant is wholly unable to prove a reasonable likelihood that the outcome of the trial would have been different but for the alleged error. At trial, it was the testimony of Thomas and Ms. Lynch that confirmed his participation in the crime and that placed him at the scene. The possibility that Ms. Starks did not actually encounter Appellant when she left the store does nothing to undermine the testimony of Thomas and Ms. Lynch. Therefore, the jury's decision would not have been likely to change regarding Appellant's participation in the crimes. For these reasons, Appellant's third assignment of error is overruled.

{¶47} Appellant has *pro se* filed three additional assignments of error in a rambling 53-page hand-written "brief." Although we granted Appellant permission to file a separate brief in this case, we did not grant leave to violate the basic Rules of Appellate Procedure. Further, our review of such briefs at this stage of the appeal,

particularly when the *pro se* brief alleges ineffective assistance of appellate counsel as is true in this case, tends to undermine the entire appellate process. Counsel and defendant are often working at cross-purposes. As discussed below, Appellant's alleged errors are largely frivolous. Additionally, the time for alleging ineffective assistance of appellate counsel is after any decision has issued, and then by use of App.R. 26(B).

{¶48} Appellant first appears to claim that his right to a speedy trial was violated and that there exists a clerical error in the journal of the court which misstates his pre-trial date. Speedy trial rights cannot be raised for the first time on appeal and must be raised at or prior to the commencement of trial. *State v. Goodwin*, 7th Dist. No. 99CA220, 2001-Ohio-3416; R.C. 2945.73(B). There is no speedy trial motion in the record prior to or at the time of trial. Also, the record is replete with filings initiated by Appellant and his counsel that delayed trial, including continuances, a motion by counsel to withdraw, appointment of new counsel, motions to dismiss, the parties' agreement to reset the trial date, motions for discovery, motion to disclose due process materials, and other tolling events. There is clearly no merit to the first *pro se* assignment of error.

{¶49} Appellant next argues that he could not be convicted of either felony murder or aggravated robbery because there was a lack of evidence placing him at the scene of the crime. Overlooking the obvious fact that there was, in fact, significant evidence placing him at or near the scene of the crime, we have already discussed that Appellant was tried as an accomplice. His lack of presence at the scene would not affect the case. A person who aids and abets a crime, *i.e.*, an accomplice, is treated as a principal offender and may be punished as such for the

acts of the other offenders. R.C. 2923.03. "The accomplice may therefore be charged under the statute defining the principal offense, and the law will impute the elements of the offense committed by the principal actor to the accomplice as an aider and abettor, as if the accomplice had committed those acts." *State v. Thompson*, 10th Dist. No. 10AP-593, 2011-Ohio-6725, ¶10. Wright and Thomas were clearly present at the scene, and their acts were imputed to Appellant. Thus, the second *pro se* assignment of error is overruled.

{¶50} Appellant's third assignment of error is that both his trial counsel and his appellate counsel were ineffective. We have already stated that his arguments regarding appellate counsel are premature. His argument as to the alleged ineffective assistance of trial counsel exclusively raises matters *de hors* the record, such as private conversations that Appellant had with counsel asking counsel to file a speedy trial motion. New matters not contained in the record are not reviewable in a direct appeal. *State v. Hartman*, 93 Ohio.St.3d 274, 299, 754 N.E.2d 1150 (2001). Appellant's third *pro se* assignment of error is overruled.

## Conclusion

{¶51} As our review of this record reveals that the trial court was well within its discretion to remove Appellant due to his disrespectful and disruptive conduct; his felony murder and aggravated robbery convictions are not allied offences and thus do not merge for sentencing purposes where there were separate victims of the two crimes; and trial counsel did not provide ineffective counsel by failing to question a defense witness regarding irrelevant facts. The issues Appellant raises *pro se* are either frivolous, premature or are based on facts outside of this record and likewise

fail for these reasons.  As his assignments are overruled because they have no merit, Appellant's conviction and sentence are affirmed.

Donofrio, P.J., concurs.

DeGenaro, J., concurs.